BOWEN, Presiding Judge.
Wanda Busbee’s conviction for the manslaughter of Rodney Watkins is reversed because it is based on no more than speculation, surmise and conjecture.
The State proved that seven-month-old Rodney Watkins died in July of 1981 from the “inappropriate ingestion or administration” of the prescription drugs Amitripty-line and Doxepin. The State proved that J.C. Busbee, his wife Faye, and his daugh *443 ter Wanda kept Rodney and other children in their home for neighbors as a day care service. The State proved that Amitripty-line and Doxepin were in the Busbees’ residence. Viewing the State’s case in its most favorable light, the State presented enough circumstantial evidence to support a finding that someone in the Busbee household — either J.C., Faye, or Wanda, or all or any combination of those three individuals — killed Rodney by giving him drugs. However, the State utterly and totally failed to present evidence as to the killer’s specific identity.
Kathy Watkins had four children: Rodney (seven months), Misty (two years), Chasity (two years), and Danny (seven years). Because she was working, she left her children with Faye Busbee at the Busbees’ home. Around July 1st, Rodney became ill after staying at the Busbees’. Mrs. Watkins took him to the doctor and kept him at home with her during her July 4th vacation. When she returned to work on July 6th, Faye came to Mrs. Watkins’ home and got her children to keep them for the first time since Rodney had been sick. Later that morning, Wanda came in the plant where Mrs. Watkins worked and told her that Rodney was sick and that she (Wanda) and J.C. had all the children in the truck. Wanda told Mrs. Watkins that Faye “was working at Sonic.”
Rodney was taken to the doctor and then kept at home on July 7th and 8th. He “seemed to be getting better.” On Friday, the 10th of July, Mrs. Watkins decided to return to work since Rodney “seemed all right.” As usual, Faye came and got the children. Sometime after nine that morning, Mrs. Watkins received a call from J.C. telling her that Rodney “was spitting up blood and that he was dying.” Faye and Wanda then came to the plant and got Mrs. Watkins. Wanda was holding “Rodney because Faye was driving.” The child was rushed to the hospital, then taken by helicopter to the Children’s Hospital in Birmingham where he died on July 13th.
After Rodney’s death, Misty had pneumonia and was taken to a hospital in Mississippi. Danny and Chasity continued to stay at the Busbees’ while Mrs. Watkins worked. They also “got sick” but were never “diagnosed as taking any of this kind of medicine that Rodney was diagnosed as taking.”
Linda Lou Harrison had an eleven-month-old daughter, Tabatha Darlene. She asked Faye to keep Darlene and her older daughter, Shay, because she was working — until she “got laid off” in June or July of 1981. “Most of the time” when Mrs. Harrison took her children to Faye, Wanda “was there until she got ready to go to school.” During that summer Wanda was home. Mrs. Harrison testified “when I called Faye to ask her to keep the kids about every time I went up there Wanda was there.”
On August 17, 1981, Mrs. Harrison arranged with Faye to keep Darlene. When Mrs. Harrison arrived at the Busbee residence at nine that morning, Faye “was already gone and J.C. and Wanda was there.” When she returned about 4:30 that afternoon, J.C., Faye, and Wanda were present. Wanda brought the infant to Mrs. Harrison. “J. C. asked her (Wanda) why did she pick Darlene up and bring her to me and she said because I was there.” Immediately Mrs. Harrison knew something was wrong with her child because she was shaking and would not wake up. Mrs. Harrison took her daughter to a doctor. Then, after the child kept having “seizures”, Mrs. Harrison took her to a hospital where “they said she had been drugged or bug sprayed.” Darlene was sent to another hospital in Memphis where the child received treatment and recovered.
Ann Couch was a registered nurse with the Marion County Health Department. On July 23, 1981, she talked with J.C. and Wanda at their house as part of a “home study or investigation.” At this time, Faye was in the hospital. However, the record does not show why. Nurse Couch returned on the 27th because “(i)t had been reported to me that those children — one had died and the other was sick and Faye was in the hospital, also, at that time.” She was conducting a home evaluation: “looking at (the) level of housekeeping, had they prepared meals, type of water, had they sprayed recently, or painted recently.” On *444 her second visit, J.C. brought her the drugs present in the residence. Among the drugs were the types that caused Rodney’s death. These drugs apparently belonged to J.C.
The Busbees had kept Mrs. Angela Wright’s son Adam since 1979 when he was five months old. Faye “primarily took care of the children” at that time. In the summer of 1981, Mrs. Wright’s other son, Shane, was sixteen weeks old and the Bus-bees were keeping both children. Faye “primarily took care of the children” during that time. Wanda was in school part of the time but did not go after January, 1981. During the first week in July of 1981, Mrs. Wright went back to work and the Busbees started sitting with her children again. “A week before July 21st” she was “called home because Shane was sick.” On Tuesday she was again called: “They told me he was sick and had the same thing that Rodney had and he was dying.” Faye called and when Mrs. Wright arrived to get Shane, J.C., Faye, and Wanda were there. The child looked “fine” at the doctor’s office. However, Mrs. Wright stayed home with Shane for the rest of the week. The next Monday, “the twentieth or twenty-first”, Mrs. Wright returned to work and left Shane with J.C., Faye, and Wanda. Later, Faye called and told her “to come get Shane that he had turned black.” Wanda was holding Shane when Mrs. Wright arrived. Faye drove Mrs. Wright and her son to the doctor. The child was then transported by helicopter to the Children’s Hospital in Birmingham, where he recovered. Amitriptyline and Doxepin were found in the child’s system. This is all the testimony the State presented which could conceivably connect the defendant to this horrible crime'.
When the State rested, defense counsel moved for a directed verdict of acquittal which the trial judge denied without comment. The defendant presented no evidence in her behalf. At sentencing, when asked if she had anything to say, the defendant stated that she was not guilty.
The State’s evidence in this case simply does not pass the test for determining the sufficiency of circumstantial evidence set forth in Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979), and approved in Dolvin v. State, 391 So.2d 129 (Ala.Cr.App.1979), reversed on other grounds, 391 So.2d 133 (Ala.1980). After reading the transcript of the evidence, this Court cannot say who killed Rodney or administered the drugs to the other children.
There is no proven motive. J.C., Faye, and Wanda each had the opportunity and means to commit the crime. Other than the bare fact that the suspects are members of one family, there is no evidence of a conspiracy. Here, there is simply no evidence from which a jury might reasonably have excluded every hypothesis except that of guilty beyond a reasonable doubt.
Since there were others who had both the means and the opportunity, this is not a case where the accused must have been the killer. Thompson v. State, 364 So.2d 681 (Ala.Cr.App.1976), cert. quashed as improvidently granted, 364 So.2d 682 (Ala.1977), appeal after remand, 364 So.2d 683 (Ala.Cr.App.), cert. denied, 364 So.2d 687 (Ala.1978). The State’s evidence does not show who was the actual killer or killers. Here, there was not any combination of circumstances which warrants a finding of guilt. “No matter how strong the circumstances, if they can be reconciled with the theory that some other person may have done the act, then the defendant is not shown to be guilty, by that full measure of proof which the law requires.” Ex parte Acree, 63 Ala. 234 (1879); Cumbo, 368 So.2d at 875.
This Court is bound by the written record presented on appeal. In this case, all that record does is cast suspicion on not one but three people. The crime committed was vile and shocking, yet we are left wondering who was the killer or killers. The evidence in this case points no more to Wanda than it does to J.C. or Faye.
We find the Attorney General’s argument unsound:
“All material circumstances in evidence point to the guilt of Wanda Busby and exclude any reasonable hypothesis except that of her guilt. The evidence is so strong and cogent as to show the defend *445 ant’s guilt to a moral certainty. Faye and J.C. Busby had kept children for years without incident. It was only after Wanda dropped out of school and Faye went to work, leaving Wanda with the children, that any child in their care was poisoned. Wanda’s guilty knowledge that the children were poisoned was apparent from the testimony of Linda Lou Harrison. While Mrs. Harrison was talking with J.C. and Faye, Wanda brought baby Tabatha and gave her to Mrs. Harrison. J.C. asked Wanda why she had done that and Wanda said, ‘Because she was here.’ The baby was having convulsions, throwing her head back and shaking, and yet Wanda did not acknowledge the child’s illness.
“It was always Faye or J.C. who noticed that the children were sick and telephoned their mothers. Even though Wanda kept them while Faye worked, she never reported their illnesses to their mothers. The jury reasonably inferred that it was Wanda who wanted the children to die. It should also be noted that Faye was hospitalized shortly after the children.”
(Attorney General’s Brief, pp. 13-14).
The facts show that the Busbees had been keeping children since 1979, that the difficulty developed in the summer of 1981 and that Wanda did not go to school after January 1981. The record does not show when Faye went to work, the only evidence of that being that Faye was not present when Wanda told Mrs. Watkins that Rodney was sick on July 6th; and that on August 17, 1981, when Mrs. Harrison brought Darlene to the Busbees’, Faye “was already gone.” There is no evidence where she had gone or exactly when she returned, although the record does show that she was home around 4:30 that afternoon when Mrs. Harrison returned to get her child.
Although Faye was not present when Mrs. Watkins got Rodney on July 6th, she was at the house when Mrs. Harrison got her sick daughter (August 17, 1981) and Mrs. Wright got her sick son (July 21st). J.C. was present all the time. Even when Wanda was attending school, she had access to the children before she went to school In the morning, and, presumedly, after she returned home in the afternoon. The record does not show when or how long Faye worked, although there is an inference that she could have been working some of the time in question. More significantly, the evidence does show that Wanda, Faye, and J.C. were all home when Mrs. Harrison and Mrs. Wright came to the Bus-bee residence to get their sick children.
Mrs. Harrison’s testimony does not display “Wanda’s guilty knowledge that the children were poisoned.” Wanda only brought the infant to her mother, there being no indication whether or not Wanda knew the infant was sick and certainly no indication that Wanda knew the child had been poisoned. The inference from the record is not that Wanda kept the children for whatever period Faye worked, but that Wanda and J.C. kept the children. At no time is there evidence that Wanda was alone in the house with the children.
Although there was no testimony as to Wanda’s age in the record, the order transferring her from juvenile court to circuit court for treatment as an adult shows that she was born December 7, 1963, which would make her 17 in the summer of 1981.
The prosecutor failed to present evidence which would reveal Wanda Busbee’s participation in Rodney’s killing. The fact that the jury convicted her only of manslaughter, although she had been indicted for murder, is perhaps an indication of the dilemma the jury faced when confronted with the insufficient evidence. The motion for judgment of acquittal was due to be granted because of the insufficiency of the evidence to convict. The judgment of the circuit court is reversed and rendered. Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).
REVERSED AND RENDERED.
All Judges concur.