LEIGH M. CLARK, Retired Circuit Judge.
Each of the two appellants had been indicted separately for intentionally causing the death of Billy Eugene Parnell, by shooting him with a 12-gauge shotgun, in violation of § 13A-6-2 of the Code of Alabama 1975. The cases were consolidated for trial, without objection by either party. Each defendant was represented by separate counsel at trial. These two separate attorneys now represent them on appeal and raise issues somewhat different from the other. Much of the evidence is not pertinent to any of the issues, and we see no need for a resume of the evidence, but we now endeavor to particularize some pertinent parts of the evidence that have a bearing on the issues presented.
Dr. LeRoy Riddick, a physician specializing in pathology employed by the Alabama Department of Forensic Sciences, testified that he performed an autopsy upon Mr. Parnell late in the afternoon of April 23, 1983, and found that he had been killed by “a blast” to his back of buckshot from a 12-gauge shotgun, which destroyed his left lung, perforated his heart, and caused the victim to bleed to death from the extensive internal injuries. The undisputed evidence shows that the autopsy was performed on the day following the night the victim was shot and killed.
The first witness who testified in the trial of the case was Mr. Charles LeNoir Thompson, who practices law in Bay Mi-nette and owns several hundred acres of land in the “Perdido Area.” He testified in pertinent part as follows:
“And did you ever have occasion to know Billy Parnell?
“A. Billy Parnell lived on my property. Looked after my cows.

“A. I don’t know who all lived with him but, of course, his wife was there and their children.
Mr. Thompson was questioned as to whether he knew the defendant, Dan James Had-ley, and he replied that he did. He said that he had told him that “he was trespassing on my property and was asked by Billy to warn him to stay away and that I would take action if I found him on my property.” He further testified that he so told him “because Billy Parnell didn’t want him there.”
Although the evidence is not as clear as it should be on the point, it appears that Mr. and Mrs. Parnell were living in a trailer, or mobile home, at or near the farm owned by Attorney Thompson.
Officer Tom Nunley, a criminal investigator employed by the Baldwin County Sheriffs Department, testified that on the morning of April 23, 1983, he “went out to the crime scene and the people I needed to talk to were not there and I went to the funeral home in Bay Minette” and then after some time told Mrs. Parnell to meet him in his office, where he “read her her rights” and then talked with her as to what she knew about her husband’s death. The following is a part of his testimony:
*1008 “Q. All right. What did Mrs. Parnell tell you?
“A. She said that she, her husband, the deceased, and Dan James Hadley and her grandson which they referred to as Jamie Bo, were at the trailer watching television.
“And she heard the dogs barking and got up and looked out the window and told her husband that the cows were out.
“And at that time, everybody got dressed, it was raining out, and they all got in her car and she went up to the forks of the road and let them out.
“And they rounded up the cows immediately and drove the cows down. Mr. Hadley on one side of the road and Mr. Parnell on the other side of the road. And they drove the cows down along with the car, directly in front and directly behind the car.
“And when they got down to the trailer, she went inside to change—

“A. She went inside with her grandson and she told me that she was changing his clothes when her husband Mr. Parnell came in and said, ‘I need a dry shirt.’ “She gave him a dry shirt and he went back out in the driving rain with his dry shirt. And she told him, ‘Just as soon as I get through changing the baby, get him dried off and dry clothes, I will come out and help you finish putting the cows up.’ “After he left, she was still changing the baby, and she heard a bumping noise, a muffled noise. She thought it was one of the dogs bumping against the door, but she raised the window and called out to her husband and he didn't answer. “So, at this point, she got the little boy, got in her car, drove down to the gate which is down behind the trailer, catty comer in behind and she saw Mr. Parnell lying in the path, the road.
“She didn’t know what was wrong with him. She didn’t check him. She just turned around immediately and went back to the trailer and got out of her car and the word she used was, ‘hooted.’ She hooted for Dan James and Dan James came immediately and she told him that Billy was down that something was wrong with him. And then James said, ‘I will run over and get the boys.’ The boys were, at that time, over at The Silver Goose shooting pool.
“She said that he went over and got the boys and while he was getting the boys, she called her neighbors whose names are — I will tell you in just a second— Harrison, Mr. and Mrs. Harrison.
“And they came down and found her sitting in the car and she got in the van with them and they drove and Mr. Harrison checked the body and then when they went back up to the house and she gave Mr. Harrison the key and Mrs. Harrison opened the trailer. They all went in the trailer and kinfolks was called. “In all of this, Mrs. Harrison called the Sheriff’s Department and got a recording so she called the Bay Minette Police Department and the Bay Minette Police Department then informed the — .”
In another part of the direct examination of Officer Nunley, the following questions were asked and answers given:
“Q. Officer Nunley, did you ask her about any insurance policies?
“A. I did.
“Q. What did you ask her?
“A. I asked her if they had any insurance on Mr. Parnell and she said, ‘Yes, they did.’
“And I asked her how much and she said she didn’t know how much or anything about it. And I asked her if she had it with her and she had it in her purse right on top of everything else and she produced a couple of insurance policies.

“A. One was a $10,000 double indemnity. The other was two $4,000 policies that was through the company that Mr. Parnell was working for.
“Q. And who were the beneficiaries of those policies?
“A. Mrs. Lillie Parnell.”
A large part of the testimony of Mr. Nun-ley was devoted to pictures and diagrams *1009 of the premises involved and the nearby surrounding territory, which extended to the Escambia County line.
Mr. Nunley testified that he had another conversation during the next day or two with Mrs. Parnell. We now quote a part of such testimony:
“Q. Did you ever ask Mrs. Parnell if she knew that Billy had been shot in the back?
“A. I did.
“Q. And what did she answer you?
“A. No, that she didn’t know it.
“Q. Did she show any response at all? Any emotional response?
“A. None whatsoever.
“Q. Did you question Lillie Mae about the bank and the trailer?
“A. We talked about that, yes, ma’am.
“Q. And what did she tell you?
“A. She told me that they were going to let the trailers go back in. That they were behind on the payments and they were fixing to lose them.”
According to the testimony of Officer Nunley, he questioned Mr. Dan James Had-ley, Jr. He did so on the next day or two after the death of Mr. Parnell. The following is a pertinent part of his testimony as to the questions asked and the answers given by Mr. Hadley:
“A. He told me that they were sitting in the trailer watching television.
“Q. Did he tell you what they were watching?
“A. Yes, ma’am. He told me they were watching the ‘Duke Boys,’ he said The Dukes of Hazzard.
“They heard the dogs barking and he said that Bill got up and looked out the window and said, ‘James, my cows are out and we had better go get them in before they ruin somebody’s fields.’ And they got dressed and got in the car with Lillie Mae, Mrs. Parnell, and drove up to the comer.
“And he said that Mr. Parnell got out where the road forks and she took him, Mr. Hadley, on up to the garden spot and let him out. He said he was in the head of the creek up there driving the cows when he heard a gun shot and then later on, he heard Mrs. Parnell hollering for him. And he ran down there and she told him that Bill was down, that something was wrong with him.
“And at that time, he went back to The Silver Goose and got the boys that were over there shooting pool.
“Q. Did he tell you where he was when he heard Lillie Mae hooting?
“A. He said he was up near the garden spot back at the head of the creek.
“Q. Now, do you know how far that is from the trailer?
“A. I would say that it is a good three quarters of a mile.
“Q. And do you recall him telling you it was raining or not?
“A. It was raining, yes, ma’am. He said that.
“Q. And what did he tell you next?
“A. He stopped everything and ran to the trailer to see what she wanted.
“Q. And then what did he do?
“A. Then, he got in his truck and drove over to The Silver Goose and got the boys.
“On the way to The Silver Goose, he stopped at the Harrison residence and told them to get down there and they informed him that they were leaving right then because Mrs. Parnell had called them and told them something was wrong with Mr. Parnell.”
There were several other witnesses in the case, including an ambulance driver, who went to the place where Mr. and Mrs. Parnell lived, within an hour or two after Mr. Parnell’s death. He testified that he “passed a house trailer and went on down towards a barn” and found a man, otherwise identified as the body of Mr. Parnell, lying in the road about 150 feet from the “gate turning into the pasture.” The witness testified also as an expert that there were no “vital signs” of the body, which he took to the funeral home. The witness testified further that he did not recall that Lillie Mae Parnell came down where the *1010 witness was, at the place the witness found the body.
James Findley, who lived at Atmore and whose wife is the daughter of Mr. and Mrs. Parnell, testified as a witness for the State. We quote from his testimony on direct examination by State’s attorney:
“Q. Now, prior to this time [the time of the death of Billy Eugene Parnell], had you ever had occasion to know Lillie Mae Parnell?
“A. Yes, ma’am.
“Q. Did you know her pretty well?
“A. Yes.
“Q. Did Lillie Mae Parnell ever discuss with you her husband, Billy Parnell?
“A. Yes.
“Q. Did she ever request you to do anything with regard to him?
“A. Please, ask that again.
“Q. Did she ever ask you to do anything to, for, or about Billy Parnell?
“A. Well on a round about way on a certain occasion.
“Q. When was that?

“A. It was in December during hunting season. One time we were at a laundry-mat washing clothes. We had taken it there to wash clothes.
“Q. Where was the laundromat?
“A. In Atmore.
“Q. Who was present?
“A. Who all was at the landrymat?
“Q. Yes, who all that you knew?
“A. Well, myself and her and my wife and my little boy, Jamie.
“Q. And what did Lillie Mae say to you on that day?
“A. She just said that she knew how I could make some money.
“Q. What did you say? Did you ask her how?
“A. I sure did.
“Q. And what did she say?
“A. She said, ‘Come down this weekend and let there be a hunting accident.’
“Q. What did you say?
“A. I said,‘Hell, no.’
“Q. Do you know who all was going hunting that week-end?
“A. Well, I don’t exactly know. I thought all of them in that family was going hunting that week-end.
“Q. Did she offer you any money if there was a hunting accident?
“A. She didn’t say any certain amount of money. She just said, T know how you can make some money.’
“Q. Do you know Dan James Hadley?
“A. Yes, uh-huh.
“Q. Did you ever see him at Lillie Mae’s house?
“A. On several occasions, I seen him there.
“Q. Do you know what kind of relationship he had with Lillie Mae?
“A. A close relationship.
“Q. Would you describe them as close friends?
“A. Yes.
“Q. Would you describe them as more than that?
“A. I guess it could be.
“MR. CHERRY [Mr. Hadley’s attorney]: Judge, she’s going to ask him to speculate about that. We object — (interrupted).
“THE COURT: I think you ought to ask him a specific fact.”
Mr. Findley was cross-examined by the attorney for Mrs. Parnell and the attorney for Mr. Hadley. We now quote a part of his testimony on cross-examination:
“Q. Tell us again, if you would, exactly what Lillie Mae Parnell said to you in the laundromat.
“A. She said, T know how you can make some money.’
“Q. And?
“A. And I said, ‘How?’
“Q. And?
“A. She said, ‘Come up to the farm this week-end and let there be a hunting accident.’
“Q. What kind of hunting accident?
“A. We didn’t go into any question about that because I said, ‘No.’
*1011 “Q. All right. Let’s talk about it. Who do you think she meant?
“A. Who do I think she might have meant?
“Q. Yes.
“A. I thought she might have meant her husband.
“Q. Did you go in and tell Bill Parnell about this?
“A. No, sir, I sure didn’t.

“Q. Somebody’s offering you money, maybe more or maybe less than $500, to have a hunting accident and you think you know who she’s talking about and you don’t tell the man?
“A. That was just my opinion of who she was talking about. No, sir, I don’t think he would believe me. He loved his wife.
“Q. Loved his wife?
“A. He sure did.
“Q. Get along pretty good?
“A. Most of the time.
“Q. Most of the time?
“A. Yes, sir.
“Q. Do you know of any marriages where everybody gets along all of the time?
“A. No, I don’t.
“Q. So, you had no reason really to believe that somebody wanted to kill him?
“A. Say that again.
“Q. You had no reason to believe that somebody wanted to kill him; did you?
“A. Maybe she was talking about someone.
“Q. All right. Who else?
“A. I don’t know of anyone else but him.
“Q. But you didn’t go tell Billy Parnell that his wife was up at the laundrymat talking about killing him?
“A. No, I didn’t, because she didn’t mention his name.”
The last witness to testify in the case on the call of the State identified herself by the name of Elizabeth Ann White, who at times had lived with Mr. and Mrs. Billy Parnell. She testified that she was with them at their trailer at supper time on the night Mr. Parnell was killed. We quote from her testimony on direct examination as follows:
“Q. You remember what time you ate dinner — ate supper?
“A. It was pretty early.
“Q. Pretty early. Now, what did y’all do after supper?
“A. We all sat around. See, earlier in the afternoon, James Hadley had brought a garbage bag full of beer which was dirty. Well, it had dirt all over it which he said had came, I guess, out of the storm or something. And the boys had washed it off and put it in the freezer to get cool.
“Q. Is this Dan James Hadley seated right there?
“A. Yes, it is. And he never had brought us beer before. And once we were just sitting around, I guess, waiting for the beer to get cool ’cause Fridays and Saturdays, we usually drink a little bit.
“Q. Friday and Saturdays, you usually drank a little bit?
“A. Uh-huh.
“Q. Okay.
“A. And while we were sitting waiting, Thomas Earl and I decided, well, we want to go out and get away from the house.
“Q. You and Thomas Earl?
“A. Uh-huh.
“Q. Now, who is Thomas Earl?
“A. That’s Lillie Mae’s brother.
“Q. Brother?
"A. Uh-huh.

“Q. Where did you decide you were going to go?
“A. Over to Buford’s place, the Silver Goose, I guess, they call it.
“Q. Did you go?
“A. Well, we had — Lillie Mae didn’t want us to go and then she decided that *1012 we could go. In order to go, she insisted that we take all the boys with us.

“Q. Did you go?
“A. Yes, we did.
“Q. Do you remember about what time it was? How long had you been sitting around waiting for the beer to get cold?
"A. A couple hours, I guess. He brought the beer around five. So it was around — well, it might have been 6:30, something till seven when we left. I’m not quite sure.
“Q. And how long had it been since you had eaten supper before you left?
"A. Just maybe a half hour, hour, something like that.
“Q. How did you get to the Silver Goose?
“A. Lillie Mae and Bill took us over there.
“Q. Did Dan James go?
“A. No, he didn’t. He said he had somewhere he had to go and he got in his truck and left. And Lillie Mae and Billy and the grand boy Jamie took us over there and dropped us off.
“Q. Do you remember the weather conditions that night?
“A. Yeah, it was raining pretty hard, stormy like. Pretty bad weather.
“Q. Now, Libby, would it be fair to say you have had a pretty rough life, had some tough times?
“A. Yes.

“Q. When you talked to your father, Libby, what did you tell him?
“A. I told him that I was in serious trouble and I needed to get home.
“Q. Did you tell him what kind of trouble you were in?
“A. Not till after I had gotten home.
“Q. What?
“A. After I had gotten home, I told him.
“Q. What did you tell him?
“A. I told him that I had killed a man [in Ohio].
“Q. Is that true?

“Q. Now, Libby, did you ever have a conversation with Lillie Mae about that fictitious, that imaginary man you had killed in Ohio?
“A. She had brought it up to me.
“Q. When was that, Libby?
“A. We were on our way from Bay Minette. She was driving the car and I was riding and she asked me—

“Q. Where were you?
“A. I was in the car. We were riding down the road. We were headed from Bay Minette to Perdido. And I don’t exactly know how the conversation got started. But she asked me, didn’t I kill a man in Toledo. And I looked at her and I said, how did you know that. She said, well, your father told me. Or she said, your dad told me. And I said — I didn’t say anything. It was kind of a confidential thing between my father and I and he shouldn't have told anybody. But she said, how does it feel to kill somebody. And she wanted to know how long did it bother me. How long it took to get over it. One thing to another. I never really answered her questions. And I asked her why she was so concerned. She said she was thinking about bumping her husband off, Billy. And she said that if I would kill him, she would give me five hundred dollars out of the insurance money. She asked me how I felt about him and if I could do it. And I told her no. And said did I know anybody that would do it. And I told her no, that she could probably check with somebody in the black community if she wanted somebody cause I didn’t know anybody up there really at the time. That’s really about all I remember.
“Q. How long was this before Bill died?
“A. A month, a couple of months. I’m not quite sure. It was shortly before his death.”
The testimony of Elizabeth White on direct examination and on cross-examination was extraordinarily lengthy, and much of it, in *1013 the writer’s opinion, sheds no light on the issues presented on this appeal. We now quote the following small part of her testimony on cross-examination by the attorney for Dan James Hadley, Jr.:
“Q. Is it Miss White?
“A. Yes.
“Q. You go by the name of Libby?
“A. Yes, sir.
“Q. Miss White, you have told us some things about you relative to your activities over in Mobile. Now, I believe Ms. Minie described it — I forgot how she described it. How would you describe what you did in Mobile?
“A. I was a prostitute.
“Q. How long were you a prostitute?
“A. Maybe a couple of months.
“Q. Just a couple of months?
“A. Yes, sir.
“Q. And you have also described you were in Kentucky and admitted to murder to your father; is that correct?

“A. I told my father. It’s a lie.

“Q. But you didn’t — didn’t it occur to you to tell this man that his wife was about to hurt him?
“A. Well, to be honest, I didn’t know whether to take her serious or not. The only thing I knew to do is I was staying with her. I didn’t know whether she was just running her mouth or whether she was serious. The only thing I knew to do was come to Lance [a narcotics agent].

“Q. Billy Parnell and Dan James Had-ley were friends, weren’t they?
“A. I guess you would say that.
“Q. They were close friends, weren’t they?
“A. Not really.
“Q. How would you describe it? They were friends but not close friends.
“A. He was closer to Lillie Mae.”
We now quote a part of the testimony of the witness, Elizabeth White, on cross-examination by the attorney for Lillie Mae Parnell, as follows:
“Q. Okay. Let’s talk about that. All these folks are saying they had been offered money by Lillie Mae to kill her husband; is that right?
“A. True.
“Q. She’s going around the countryside offering everybody in the countryside money to kill her husband?
“A. Yes, sir. I suppose so.

“Q. You and I talked some last night, didn’t we?
“A. Yes, sir.
“Q. And you told me you had been in Bowling Green, Kentucky for how long?
“A. On and off, from the time I left here, I was in between Bowling Green and Franklin.
“Q. And you waited all this time to contact Mr. Nunley; is that right?
“A. Yes, sir.
“Q. What did you tell Mr. Nunley when you talked to him?
“A. That I wanted to come back and testify; that I was afraid for my life. And that I would come back if I could have protection of some kind.
“Q. Just out of the goodness of your heart, you were going to come back and testify?
“A. Out of the goodness of my heart.
“Q. Excuse me.
“A. Out of the goodness of my heart.
“Q. Yes, ma’am. Is that what you are telling the jury, just out of the goodness of your heart, out of the blue, you called up Mr. Nunley and said I want to come and testify?
“A. No, sir. I’m just saying I had called home before I had talked to Mr. Nunley. And I wanted to come home for a long time but I was afraid because I was afraid for my life.
“Q. The fact that you still have charges pending against you has nothing to do with you wanting to come back here and testify?
*1014 “A. I would like to get those off my back too.
“Q. The fact you have three felony charges of theft and a drug case pending against you right now, has nothing to do with your testimony?
“A. No, sir.”
The only witnesses who testified on call of defendants were the defendants themselves. We now quote from a part of the testimony of Lillie Mae Parnell:
“Q. Did you kill him?
“A. No, sir, I sure did not.
“Q. Did you plan with anybody else to kill your husband?
“A. No, sir, I did not.
“Q. Did you and Dan James Hadley plan to kill your husband?
“A. No, sir, we did not.
“Q. Did you ever offer any money to Jim Findley to kill your husband?
“A. No, sir, I did not.
“Q. Did you ever offer any money to Libby White to kill your husband?
“A. No, sir, I did not.
“Q. Lillie Mae, did you ever offer anybody any money to kill your husband?
“A. No, sir, I sure did not.”
Mrs. Parnell continued to testify as to her innocence by relating somewhat in detail that which occurred on the night of her husband’s death that in general was consistent with what has already been stated in this opinion as to the testimony on behalf of the State. We now commence with the noise she said she heard and as to which she testified on direct examination by her attorney:
“Q. And you said you heard a noise outside. Do you know what kind of noise that was? Do you remember that far back?
“A. No, sir, just a little old bump like somebody knocked on the door.
“Q. And when you heard that noise, what did you do, please, ma’am?
“A. Well, I got up. I locked the door. And I hollered and asked — rolled the window out, and I asked, I said, honey, was that you. And I said, honey, was that you. And then he didn’t answer. So I said, well, we’ll just go down to the cow pen.
“Q. Speak up and slow down. These folks can’t hear you.
“A. I told the baby, we’ll just go down to the cow lot to see if that was him, you know, bumping on the door. And I saw him laying on the ground.
“Q. When you went down to check on him, did you have anybody with you?
“A. The baby.
“Q. You had the baby with you?
“A. Yes, sir.
“Q. When you saw Billy lying there on the ground, did you try to disturb him, move him in any way?
“A. No, sir, I just hollered, called him. He didn’t answer and I run back — you know, we got in the car and went back to the house.
“Q. And then when did you see Dan James Hadley?
“A. Shortly after I started to holler.
“Q. Were you hollering for him or somebody in particular?
“A. No, I was hollering, you know, for help, help.
“Q. And did he come in response to your call?
“A. Yes, sir.
“Q. And who did you call next?
“A. Eloise Harrison.
“Q. That’s the lady who testified this morning?
“A. Yes, sir.
“Q. Did you go anywhere else that night?
“A. No, sir. We just took the kids to the Silver Goose.
“Q. After y’all found Billy and all the folks came to the house, did you leave the house again that night or leave the trailer again?
“A. No, sir, Eloise gave me — she said it was a nerve pill. And it just knocked me out.

“Q. Everybody has been jumping all around this issue and nobody has come *1015 right out and said it or asked anything about it. Were you and Dan James having an affair of any kind?
“A. No, sir, sure was not.
“Q. What was your relationship with Dan James Hadley?
“A. Just good friends. We’re kin to each other.
“Q. Kin to each other?
“A. Yes, sir.
“Q. Good friends?
“A. Yes, sir.
“Q. To your knowledge, were he and Billy friends?
“A. Yes, sir.
“Q. Did Dan James ever help out around the farm there?
“A. Yes, sir. Mr. Thompson would get him to help haul hay and stuff like that, fix fences or something.
“Q. Did he have meals with you and Billy and the family?
“A. Yes, sir, he sure did.
“Q. And he did bring that furniture there, didn’t he?
“A. Yes, sir.
“Q. Do all of you use that furniture?
“A. Everybody used it.”
On cross-examination by the attorney for Dan James Hadley, Jr., Mrs. Parnell testified in part as follows:
“Q. Relative to your relationship to Dan James Hadley, is it your testimony today that you were not lovers?
“A. Sir?
“Q. Y’all did not have a relationship? You understood what his question implied, didn’t you?
“A. Yes, sir. No, sir.
“Q. Did you have any sexual relationship with Dan James Hadley?
“A. No, sir, we did not.
“Q. He was, in fact, kinfolk, was he not?
“A. That’s right.
“Q. Did he come to your house often?
“A. Yes, sir, he come when he wanted to.
“Q. And how would you describe the relationship between he and Billy?
“A. Just like brothers.”
On cross-examination by the State’s attorney, Mrs. Parnell testified that she never offered Mr. Hadley any money to kill Billy, that she never told him how they “could arrange a hunting accident” and never offered any money to anyone or suggested that she would pay anyone to kill her husband. As to what happened on the night of her husband’s death during the time that an effort was made to get the cows that were “out” back inside the premises, she testified:
“Q. So, after you saw the cows were out, what did you do next?
“A. I told him [her husband] — I said, honey, there goes everyone of them cows up the road running.
“Q. Running?
“A. Yes, ma’am.
“Q. And then what did you do?
“A. He said, well we got to go get them in. So we went up to get the cows in.
“Q. You and who?
“A. Me and my husband and Dan James and Jamie, my grandson.
“Q. And what did you do?
“A. I taken them up the road and put them out and then I turned the car around. Me and the little baby, we went back to the house.

“Q. You let them both out in the same place or did you let them out in two different places?
“A. They both got out and one went on one side and one on the other side.
“Q. And which side did Billy go on?
“A. He went on the driver’s side, to the left.
“Q. Where did he go to?
“A. I don’t know. I wasn’t with him.
“Q. And where was Dan James?
“A. Over on the other side running the cows down.
“Q. Where were the cows?
“A. Up there in the road and up in the fields.
*1016 “Q. Which side of the road were the cows on?
“A. Both sides.

“Q. Then what did you do?
“A. Turned the car around and me and the baby started back to the house.
“Q. And how did you turn the car around?
“A. I had to go up there and turn around in that driveway.
“Q. What driveway?
“A. Where (inaudible) Hadley had his trailer parked.
“Q. Where is that?
“A. Up at the forks.
“Q. Up at the forks. Did you have to pass James and Eloise’s house?
“A. No, ma’am.
“Q. Then what did you do?
“A. Went back to the house.
“Q. How long did you stay in the house?
“A. I’m not good on time. I’d say about thirty-five minutes.
“Q. Was the T.V. still on?
“A. Uh-huh.
“Q. What were you doing in the house?
“A. I was drying the baby up.
“Q. Then what did you do?
“A. I heard a bump and I got up and locked the door and that’s when I started calling him.
“Q. Then what did you do?
“A. We got in the car and we went down there and I seen him and I come back and started hollering.
“Q. What car was it?
“A. That Chrysler.
“Q. How did you know where he was, Lillie Mae?
“A. Ma’am?
“Q. How did you know where he was?
“A. Cause he had come by the house and got a dry shirt and got him a dry cigarette.
“Q. You didn’t tell us that earlier.
“A. You didn’t ask me that earlier either.
“Q. When did he do that, Lillie Mae?
“A. Whenever he brought the first herd of cows up.
“Q. How many cows did he have the first time?
“A. I don’t know.
“Q. So, how many times did he come by the house?
“A. One time.
“Q. And what did he do? Did he have to knock on the door or did he come straight in?
“A. He just opened the door and come on in.
“Q. And he got a dry shirt?
“A. He told me to give him a dry shirt.
“Q. Did you give him a dry shirt?
“A. I sure did.
“Q. Then what happened?
“A. He went back out to run the cows and never did come back and I kept hearing — I heard that bump, just a light bump. And I hollered and asked him, was that him. I said, honey, is that you. And he never answered me and then that’s when I got the baby and went and got in the car and left and went down there.
“Q. How long after you let him out did he come in for the dry shirt?
“A. Just a few minutes. Ten or twenty minutes.
“Q. Then what happened? You got to speak up so they can hear you.
“A. When I went down there, that's what I found.
“Q. How did you get down there?
“A. We drove the car down there.
“Q. What car?
“A. The Chrysler.
“Q. You and Jamie?
“A. Yes, ma’am.
“Q. Little four year old?
“A. Yes, ma’am.
“Q. How close did you get to him?
“A. I didn’t get real close. I seen him laying on the ground and I run back calling for help.

*1017 “Q. And where did you go?
“A. To the house.
“Q. And what did you do in the house?
“A. I started hollering. I called Eloise and told her to come down, that something had happened to Bill.
“Q. And how long did you stay in the house?
“A. Just a second.
“Q. And then what did you do?
“A. I went back out there in the car with Jamie. I was all upset. I panicked.

“Q. Lillie Mae, I may have missed something. But when did Dan James show up or did he not ever show up?
“A. Yes, ma’am. He showed up when I started screaming and hollering for help.
“Q. Where were you?
“A. Right there at the car.
“Q. At the car. And how long was that after you had let him out up at the forks of the road, up at the garden spot?
“A. I would say about fifteen, twenty, thirty minutes.
“Q. Where did he come from?
“A. I don’t know.
“Q. He just appeared?
“A. It was dark, raining, you couldn’t see.
“Q. He just appeared.
“A. When I hollered.
“Q. What did you tell him?
“A. I told him, I said, run and get them young’uns. Something has happened to Bill. And I said stop by and tell James and Eloise. And I said I was going to call. And I took off down there and started to call for help. And then when I got Eloise on the phone, well, I went and took the baby and I run, got back in the car. And that’s where I was at when Eloise and James got there.”
The defendant, Dan James Hadley, was the last witness who testified on the trial of the case. He gave his age as thirty-nine years, and we quote part of his testimony on direct examination:
“Q. And I’m going to ask you like Mr. Cherry asked his client, did you have anything to do with the killing of Billy Parnell?
“A. No, sir, I did not.
“Q. Did you have any relationship, any sexual relationship — [sic]?
“A. No, sir, I did not.
“Q. Describe your relationship to Billy Parnell before he was killed?
“A. Me and Billy Parnell, we got on better than me and my brother do.
“Q. He was your good friend?
“A. Best friend I had.
“Q. Now, relative to the furniture, did you go down there to the furniture store and help Billy Parnell get some furniture?
“A. I sure did.

“Q. So, you went down and co-signed for Bill, didn’t you?
“A. Yeah, Bill would make the payment on it.
“Q. I got you. Now, relative to the night in question, did you — were you present that night?
“A. Yes, sir.
“Q. When did you arrive at the house?
“A. I went over there that morning at 10:00.
“Q. Ten o’clock?
“A. And helped work on Bill’s car.

“A. ... Me and Bob Parnell, Bill’s brother.
“Q. Bill’s brother. You and Bill’s brother were working on it. How long did you all work on the car?
“A. We worked on it all day until about five o’clock that evening.
“Q. Did you have supper with them?
“A. Yes, sir.

“Q.Did you go to the Silver Goose?
“A. Yes, sir.
“Q. How did you get there?
“A. Went with Bill.
“Q. You and Bill went?
*1018 “A. Me and Bill and Mrs. Pamell and grand-baby and Bob and Jess and Tom and Tom Earl and Ann White.
“Q. Nothing unusual about having ten Hadleys [sic] in a Chrysler?
“A. No, sir.
“Q. And you all went to the Silver Goose, didn’t you?
“A. Yes, sir.
“Q. How did you get back from the Silver Goose?
“A. Come back in the car with Bill.
“Q. In the Chrysler?
“A. Yes, sir.
“Q. Who all came back with you?
“A. Me and Bill and Mrs. Pamell and the grandbaby.
“Q. Do you remember about what time this was, Dan James?
“A. It was about 6:30, I imagine.

“A. ... and I reckon about eight, quarter to eight, the dogs started barking. All right. Bill’s wife got up and looked out the door. We told Bill — we turned around — that the cows was out. Bill said, don’t be joking with me about that. Cows ain’t out. Yeah, they are. And Bill got up and walked out the door and Bill said, they are out. And James, it be nine o’clock before I supposed to go pick the boys up. How about you helping me get the cows back in. [The last two sentences are quoted as they are found in the transcript, but, although there are no quotation marks, we assume that they contain the testimony of the defendant Hadley as to what Mr. Pamell said to Hadley].
“Q. What did you tell him?
“A. I told him I would.
“Q. Did you get out?
“A. Yes, sir.
“Q. Where did you go?
“A. Went to the fork of the road.
“Q. Is that the fork of the road?
“A. Yes, sir.
“Q. This is where you are talking about, somewhere in this area?
“A. Yes, sir.
“Q. Where did Bill go?
“A. Cows went — one cow went back across the field.
“Q. Which way? This way.
“A. Back—
“Q. This way?
“A. Yeah. Back toward the house.
“Q. This way?
“A. Uh-huh.
“Q. All right.
“A. All right. Bill took that bunch. The other bunch went the other way and I had a big flashlight and Bill told me, if you would you take the other bunch because I ain’t got no light.
“Q. He didn’t have no light?
“A. No, he didn’t have no light.
“Q. And Bill took the bunch closest to the house?
“A. Yes, sir.
“Q. And you went after the other bunch?
“A. Yes, sir.
“Q. Where did the other bunch go to, Dan James?
“A. Went way over there toward the highway, over there on the grass patch. Up above James Harrison’s.
“Q. Up in here?
“A. Uh-huh.
“Q. That’s where you went to get them?
“A. Yes, sir.
“Q. And Bill came toward the house?
“A. Yes, sir.
“Q. What’s the next thing you remember, Dan James?
“A. I got my cows and got head back toward the house and come through branch (sic) here. And then when I got down to the branch here I hear boom. I couldn’t tell what it was. Didn’t know. I come on up to the top of the hill. That’s where old garden place was where James Harrison ain’t got no garden. I hid. I couldn’t tell for sure what was in it. I went on down by the forks of the road. Got near about the forks of the road—
*1019 “Q. Wait just a minute. Hold on just a minute. Let’s slow down just a little bit. I know I’m having trouble. I don’t know if the jury can understand it or not but I’m having trouble. Okay.
“A. All right.
“Q. Not picking on you. I just want you to slow down a little bit.
“A. Got on down here about the forks of the road. I hid—
“Q. That’s where I lost you. Near about where?
“A. Near about down to the forks of the road.
“Q. Fork of the road? Okay.
“A. And I hid. I hollered again and I about figured it out it was down toward Bill’s house and I went on. I hear it again. I took on off down towards the house. And when I got down about the mailbox I heard a car. And Mrs. Parnell was screaming or hollering and the baby was too. I asked her what’s the matter. I got to get them boys. Something’s the matter with Bill.
“Q. Something’s the matter with Bill? “A. Yeah. Let me go get the boys and you call for help.
“Q. What did you do?
“A. I jumped in my pickup and went to the beer joint, pool hall.
“Q. Did you make any stops in between there?
“A. Yeah. I stopped at James Harrison.
“Q. This house?
“A. James Harrison’s house.
“Q. Is that the first occupied house in that area?
“A. No, sir. There’s one more, old woman.
“Q. She couldn’t help much, could she? “A. No, sir. And she had a dog that would eat you up if you went to the house.
“Q. I understood you then. So, you stopped at the first house you could stop by?
“A. Yes, sir.
“Q. And that was the Harrison’s house?
“A. Yes, sir.

“A. I told them to go down there with Mrs. Parnell. We need help. Something’s the matter with Bill.
“Q. You hadn’t seen Bill?
“A. No, sir, I had not.
“Q. And didn’t know what was wrong with him?
“A. No.
“Q. Didn’t know he had been shot?
“A. No, sir, I didn’t know he had been shot.
“Q. All right. Then what did you do?
“A. I got back in my pickup and went on to the Goose or Silver Goose or somehow or the other. I called it Haddy’s Place.

“I turned around and went on out the door and they said what’s the matter. Something the matter with Bill. I don’t know what. I jumped — we all got in the truck and we went on back over there to the house.

“Q. Are you telling this jury the truth?
“A. Yes, sir, I is.
“Q. Did you have anything at all to do with the death of Billy Parnell?
“A. No, sir, I did not.
“Q. Have you ever had a relationship, sexual, with Billy’s wife?
“A. No, sir, I have not.“
During cross-examination by counsel for the State, Dan James Hadley, Jr., testified in part as follows:
“Q. So, what did you do with the cows Dan James?
“A. I drove on back down there to the forks of the road and went across there.
“Q. You drove them down to the fork in the road?
“A. Yes, ma’am.
“Q. And they went across there and then what?
“A. They went on toward the house. And I hear Mrs. Parnell hollering and I *1020 took them off down through there to go see what was the matter.
“Q. And where did you take them to?
“A. At the forks of the road and went across the road out in that field there.
“Q. Over into that field back there?
“A. Old field place.
“Q. And then what did you do?
“A. I went on down toward the house to see what was the matter.
“Q. What about the cows?
“A. The cows, I reckon they went on to the house. I don’t know where they went.
“Q. You just left the cows out?
“A. Yes, ma’am.
“Q. Then what happened?
“A. I got up to the house and Mrs. Parnell come running out of the house to get in the car and we were stopped. Her and the baby were screaming and hollering. I asked them what was the matter. Told me, Bill was down. Had to get the boys. I told her, you call for help; I’ll go get the boys.
“Q. Where were you when you heard her hollering?
“A. Up there toward the forks of the road.
“Q. Fork in the road?
“A. Yes, ma’am.
“Q. That’s a quarter of a mile, isn’t it?
“A. I imagine so. You go way around through.

“Q. Was it a mud pie that night?
“A. It was muddy. I don’t know how it was down in that field cause I didn’t go down in that field.

“Q. And you told everybody that the cows got out but they didn’t get out?
“A. Yes, ma’am, them cows got out.
“Q. Did you ever go down and look at Bill?
“A. No, ma’am. I went down one time. Went down and picked that boy up and it dark.
“Q. Did you touch Bill?
“A. No, ma’am.
“Q. Did you look at his face?
“A. No, ma’am.
“Q. Your best friend?
“A. Best friend. No ma’am, I did not.
“Q. Your family. As close as your family?
“A. Close friend I had.
“Q. And you left him down there in the mud with water running all over him?
“A. Yes, ma’am, cause I couldn’t help him.”
The last testimony of any witness in the case consisted of the question and answer last quoted above. Promptly thereafter, there was an “In chambers conference” among the trial judge and the attorneys as to a stipulation proposed by the attorney for defendant Hadley, which was agreed upon by the attorneys, and it was thereafter stated to the jury by counsel for the State as follows:
“At this time, because of the absence of Mr. Kenneth Cooper, who is an attorney here in Bay Minette, it has been stipulated and agreed between the parties in this case that we will agree that there was a pleading filed with the Court alleging there had been certain misappropriations of funds of the estate and that there was a possibility that a trailer may have been sold out of the estate of Billy Parnell by Rose Findley.”
Thereupon, an attorney for each of the parties made clear that Mr. Cooper, the attorney, was the attorney for the estate of Mr. Billy Parnell and that each of said attorneys was satisfied with the statement of the stipulation by the attorney for the State. The trial judge then said, “Ladies and Gentlemen, you may consider that as evidence in the case. Anything further?” All concerned then made it known that no further evidence would be introduced in the case and the attorneys for the parties made their oral arguments to the jury.
We probably should state that at times during the trial of the cases, the finger of suspicion was pointed at someone other than either of the two defendants as one who was guilty of the death of Mr. Parnell *1021 and particularly that someone other than defendant Hadley fired the twelve gauge shotgun that killed Mr. Parnell, but the evidence was so unclear as to any such contention that we think it appropriate not to state the names of anyone to whom such suspicion was directed. We think also that it is unfortunate that the State was unable to prove the ownership and particularity of the gun from which the shell was fired that killed Mr. Parnell. Mention was made in the evidence of a shotgun owned by a man who lived in the general vicinity of the Parnells, and there was some evidence as to some shotguns owned by defendant Hadley. Officer Nunley testified that defendant Hadley showed Officer Nunley Hadley’s shotguns and that the officer “smelled all of them” and that “There was one double barrel 2-gauge that smelled of gunpowder.”
The writer has taken the course of quoting the testimony of most of the witnesses in the case, rather than attempt to narrate their testimony, for the reason that probably such a narrative would not be satisfactory to all concerned. We now proceed to discuss the issues raised by the appellants in an effort to reach a correct conclusion as to what action should be taken by this Court as to such issues. Although we have captioned this opinion in the same order as the names of the appellants are set forth in the transcript, with Hadley being first and Parnell being second, which is in the reverse order of their numbers in the Circuit Court, we think it better to discuss the issues in the Parnell case first, largely for the reason that more issues are presented on appeal by the appellant Parnell than by the appellant Hadley.
ISSUES IN THE PARNELL CASE
ISSUE ONE
Counsel for appellant Lillie Mae Parnell captions this issue as follows:
“WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT DEFENDANT’S MOTION TO EXCLUDE TESTIMONY BY A STATE WITNESS REGARDING A WEAPON NOT USED IN THE CRIME CHARGED; AND FAILING TO INSTRUCT THE JURY TO DISREGARD THE REMARKS.”
Before proceeding with a discussion of this issue, we quote the first paragraph of the same attorney in his STATEMENT OF THE FACTS, as follows:
“The record in this case was taken by four court reporters using different numbering systems. The Indictments, Verdicts, Written Motions, Orders and Exhibits are numbered consecutively and referred herein with the designation T. The trial record reported by the first reporter is designated by the prefix ‘R’. The trial record reported by the second reporter is designated by the prefix ‘RR’. The trial record reported by the third reporter is designated by the prefix ‘RRR’. And the trial record reported by the fourth reporter is designated by the prefix ‘RRRR’.”
The attorney on appeal for Lillie Mae Parnell takes the following position:
“Investigator, Thomas Nunley, used a good deal of his time on the witness stand testifying regarding a shotgun which belonged to co-defendant DAN JAMES HADLEY. The weapon was never introduced as evidence, nor was there any attempt by the State to offer the weapon into evidence as the murder weapon, or for any other purpose. (R-91).
“Nunley’s testimony was uncontradicted that the weapon, after being tested, was found not to be the murder weapon. (R-91). Therefore, the testimony regarding the weapon shed no light on the homicide. It is submitted that the one and only reason the State elicited this testimony was to influence the passions of the jury against the defendants and prejudice them against the defendants.”
Counsel for appellant Parnell proceeds therefrom to cite cases in support of his contention that it is reversible error for the State to introduce testimony solely for the purpose of influencing “the passions of the jury against the defendant and prejudice *1022 them against the defendants.” We are in accord with such contention and the authorities cited to support it, but we are not in agreement with the conclusion of the attorney for appellant Parnell, as found in the last paragraph of his argument as to this issue:
“The victim in the present case was killed by a shotgun, which was never found, the shells were never found, and having no weapon to introduce at trial, the State attempted to impart to the jury the strong inference that the weapon used was owned by co-defendant. In view of the total scenario at this trial, and the totality of the prejudicial materials, reversible error occurred.”
ISSUE TWO
This issue is captioned in the brief of counsel for this appellant as follows:
“WHETHER THE VERDICT IS CONTRARY TO THE GREAT WEIGHT OF THE LAW AND CONTRARY TO THE WEIGHT OF EVIDENCE AGAINST OTHERS AS OPPOSED TO THE INSUFFICIENCY OF THE EVIDENCE AGAINST THE DEFENDANTS.”
The following is a part of the argument of this appellant’s attorney as to this issue:
“Not once, but at least on three occasions, the prosecutor attempted to elicit testimony as to Defendant’s relationship with her cousin, the co-defendant, insinuating a sexual relationship. The prosecutor asked these questions in open court, before the jurors, filling their minds with prejudice and disbelief, knowing again that against negative answers, she had no legal proof, only corrosion of half-truths and speculation a thousand times more damaging to the appellant than could be eradicated. (R-24).”
We agree with counsel for this appellant that the prosecuting attorney endeavored to cause the jury to believe that there had been a sexual relationship between the two defendants, notwithstanding the fact that she had no eyewitness testimony to any sexual relation between the two. The prosecuting attorney is not to be condemned for endeavoring to convince the jury by evidence that there had been sexual relations between the two defendants, and we are of the opinion that the prosecuting attorney was successful in that endeavor.
We now quote the last paragraphs of the brief of counsel for this appellant as to Issue Two:
“Here, the evidence against appellant is, as stated, circumstantial. Alabama law has long provided that in a murder prosecution, a defendant has the right to show that someone else may have been guilty in exoneration of himself, in order to rebut circumstantial evidence against him. Green v. State, 64 So.2d 84, 258 Ala. 471; Alldredge v. State, 431 So.2d 1358 (Ala.Cr.App.1983); Hardison v. State, 200 So. 635, 30 Ala.App. 40, cert. denied, 200 So. 636, 240 Ala. 647 (Ala.App.1941); Davis v. State, 62 So. 382, 8 Ala.App. 211 (1913).
“Throughout the trial of this cause, the jury was bombarded with accusations unproved, charges that could not be substantiated, falsehoods, and non-sequiturs of the State. It is submitted that without them, a fair trial would have been had, the Appellant would be exonerated.” We agree with the attorney for this appellant as to the first of the two paragraphs. We disagree with him as to the second.
ISSUE THREE
This issue of this appellant’s attorney is thus stated in his brief:
“WHETHER THE ARGUMENTS OF THE PROSECUTOR, WHEN CONSIDERED AS A WHOLE, CONSTITUTED PREJUDICIAL ERROR IN CREATING AN ATMOSPHERE OF BIAS AND PREJUDICE WHICH COULD NOT BE ERADICATED.”
Typical of the argument in support of this issue in brief of counsel for this appellant is the following paragraph of the argument:
“The prosecutor simply cannot go outside the record to abuse, accuse and villi *1023 fy the defendant with illegal statements. Borden v. State, 337 So.2d 1388 (Ala.Cr.App.1976); Knaffl vs. State, 335 So.2d 400, cert. denied, 335 So.2d 405 (Ala.Cr.App.1975); or argue facts with no foundation. Beard v. State, 95 So. 333, 19 Ala.App. [102] 104 (1923); Peterson v. State, 166 So. 20, 231 Ala. 625 (1936); Allred v. State, supra; Campbell v. State, 97 So. 783, 19 Ala.App. 349, cert. denied, Ex parte Campbell, 99 [97] So. 785, 210 Ala. 364 [264] (1923).”
We agree with the statement quoted of counsel for this appellant and would gladly follow the authorities cited therein, but we do not agree with the implication of counsel for this appellant that the prosecutor went “outside the record to abuse, accuse and villify the defendant with illegal statements,” nor are we convinced that she influenced the jury to render a verdict against defendant in violation of their oath to render a true verdict in the case.
In our opinion, Issue Three as presented in brief of counsel for this appellant is not well taken.
ISSUE FOUR
This issue is thus captioned in brief of counsel for this appellant:
“WHETHER THE PROSECUTOR SHOULD HAVE BEEN ALLOWED TO QUESTION A STATE WITNESS AS TO THE WHEREABOUTS OF ANOTHER STATE WITNESS NOT IN ATTENDANCE AT TRIAL.”
This particular issue is directed at the following part of the direct examination of a married woman, a neighbor of the Par-nells, as follows:
“Q. Where is Mr. [the husband of the witness] today?
“A. He’s in the hospital in Mobile at U.S.A. Medical Center.
“Q. What’s the. matter with him?
“A. He’s got pancreas problems. They may have to do surgery and remove some of it.
“Q. How long has he been in the hospital?
“A. Off and on or this time [sic]? This time he has been in the hospital for approximately two weeks.
“Q. Is he going to be able to come to court?
“MR. WHETSTONE [Attorney for Defendant Hadley]: Your Honor, I object to that. I don’t know the relevancy of it at all.
“MS. MINIC: We subpoenaed him as a witness.
“THE COURT: Overruled.
“A. Answer?
“Q. Yes, ma’am.
“A. I don’t know if he will or not because they are doing the tests today to see if they have to do the surgery.
. “Q. Did you know your neighbors, the Parnells?
“A. Uh-huh.
“Q. How long had you all been neighbors down there?
“A. Five or six years. I really don’t know.
“Q. Do you remember the night that Billy Parnell died?
“A. Uh-huh.
“Q. Where were you that night?
“A. At home.
“Q. Do you remember the weather conditions?
“A. Yes, ma’am. It was raining real bad.”
The argument is made in the brief of counsel for this appellant that the question objected to by this defendant’s attorney was “presumably to bolster the credibility of the State’s case, especially since the prosecutor knew or would have known that questions on cross-examination would uncover Mrs. [the witness] conviction for theft of Mr. Thompson’s cows,” and that “The inference to be and is that Mr. [the husband] would verify his wife’s testimony had he been in court.” Reliance is had by this appellant’s attorney as to this issue upon Elliott v. State, 48 Ala.App. 515, 266 So.2d 318, cert. denied, 289 Ala. 742, 266 So.2d 321 (1972), wherein it was stated at 266 So.2d 320:
*1024 “In Johnson and Means [two of the three appellants whose cases had been consolidated on appeal with that of Elliott] the Sheriff of Baldwin County was allowed, over objection, to testify that a subpoena was issued for Dr. Hogan in Mobile, Mobile County, but that it could not be served because Dr. Hogan was out of town. The testimony was inadmissible as a conclusion and was hearsay. Burrow v. State, 23 Ala.App. 99, 121 So. 449.”
The case does not support the contention made by this appellant’s attorney as to Issue Four. We are of the opinion that the numerous questions of the prosecuting attorney to the witness as to the absence from court of the husband of the witness were unduly prolix, but we are not convinced that the questioning of the witness complained of was prejudicial to either of the defendants.
We have completed our discussion of the issues presented by counsel for appellant Parnell other than Issue Two, by which the attorney for appellant Parnell contends that the verdict finding her guilty of murder of Mr. Parnell “is contrary to the great weight of the law and contrary to the weight of the evidence as against other persons as opposed to the insufficiency of the evidence against defendant.” We will defer our discussion of such issue until we have discussed the issues presented in brief of counsel for appellant Hadley.

DAN JAMES HADLEY, JR. V STATE

The only issue presented in brief of counsel for defendant Hadley is thus captioned in his brief:
“WHETHER THE CIRCUMSTANTIAL EVIDENCE PUT FORTH BY THE PROSECUTION WAS SUCH THAT THE GUILT OF DAN JAMES HADLEY WAS THE ONLY CONCLUSION FAIRLY TO BE DRAWN FROM SUCH EVIDENCE?”
A large number of cases are cited in the brief, commencing with Bluth v. State, 38 Ala.App. 692, 92 So.2d 685 (1957), and ending with Busbee v. State, 451 So.2d 442 (Ala.Cr.App.1984), in support of this contention. All of them are in accord with what was said by Judge Harwood in Bluth v. State, at 92 So.2d 690, as follows:
"... An accused charged with a felony should not be convicted on circumstantial evidence unless it shows by a full measure of proof that the defendant is guilty, and must exclude to a moral certainty every other reasonable hypothesis but that of the guilt of the accused, if the facts and circumstances can be reconciled with the theory that some agency other than the accused may have caused the death, then the accused is not shown to be guilty by that full measure of proof which the court requires. Lang v. State, 252 Ala. 640, 42 So.2d 512; Ellison v. State, 254 Ala. 428, 48 So.2d 176.”
The attorney for defendant Hadley has correctly set forth in his brief the material facts in some of the cases cited in which it was held that the circumstantial evidence therein was not sufficient to uphold a verdict and judgment finding appellant guilty of the crime charged, but we conclude that none of the cases cited constitutes a precedent for a determination by us that the verdict and judgment finding defendant Hadley guilty of the murder of Mr. Parnell was not “the only conclusion fairly to be drawn” from the circumstantial evidence presented on the trial of the cases.
There was sufficient evidence from which the jury might conclude beyond a reasonable doubt that the defendants had found a community of purpose and acted in concert.
It is argued by attorney for appellant Hadley, as well as counsel for appellant Parnell, that there were one or two individuals other than either of the defendants that would have had a motive for killing Mr. Parnell and that the evidence did not show that such an individual was not the one who killed Mr. Parnell. We consider that any and all evidence to the effect that some other definite individual killed Mr. Parnell was weak and that the jury was justified in concluding that no one other than the two defendants had any part in *1025 causing the death of Mr. Parnell and that no one other than defendant Hadley fired the gun that killed Mr. Parnell.
CONCLUSION OF THIS COURT AS TO WHETHER THERE WAS SUBSTANTIAL EVIDENCE AGAINST BOTH DEFENDANTS THAT THEY WERE GUILTY OF THE MURDER OF MR. PARNELL.
Whether these cases should have been consolidated for trial is not for us to decide, but we doubt that either defendant would have gained anything by a separate trial, as it seems to us that, if either defendant was guilty, the other defendant was guilty also. We have no reason to believe that the jurors who returned a verdict of guilt against each defendant were not guided by the highest principles in determining that each defendant was guilty. We find no error, prejudicial to either defendant, by the trial judge, a resident judge of the adjoining county of Mobile. As to each of the cases, the judgment of the trial court court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the court.
AFFIRMED. .
All the Judges concur.